The last case this afternoon is 4-12-05-15. In re. Marriage of Turngren, for the appellant is Kristen Fisher, for the appellee is Betsy Pendleton-Wong. Ms. Fisher, you may proceed. Thank you. May it please the court, counsel. By way of introduction, I'm Kristen Fisher. I, with Mr. Majernik, represented Dr. Turngren in the proceedings before Judge Black. Those proceedings essentially came about as a result of a 2004 judgment of dissolution of marriage in which a maintenance award of $7,200 a month was done by agreement. In 2010, on behalf of Dr. Turngren, I filed and requested from Judge Blackman two things. One, either termination or modification. I think it's important to understand what we all agree. Both sides agree that the former Mrs. Turngren is an appropriate candidate for permanent maintenance. If that were not so, I would not have suggested to Judge Blackman that we did not wish to proceed on the termination. Where we differ is, have there been a substantial change of circumstances since that 2004 judgment that allows the court then to review and modify Dr. Turngren's maintenance award? And there, there is quite a divergence between obviously the court, Ms. Wong, and myself. And I think that that divergence starts in large part with the court's perception of Dr. Turngren today. It is not a case that the court should look at where Dr. Turngren is today. And that is for several reasons. The first of which is, Dr. Turngren would not be where he is today, but for his post-judgment efforts in getting a master's in business administration done after the divorce. Done during his current marriage tenancy. Those efforts allowed him to alter his income by a relatively significant amount from the $275,000-$300,000 a year when the maintenance was awarded to $400,000 plus bonuses. And also, let me stop you there. Under the statute, isn't the court required to consider the increase or decrease in each party's income since the prior judgment or order from which a review, modification, or termination is being sought? I believe that the court, that one of the factors the court should consider when it determines that there has been a substantial change of circumstances is each party's increase or decrease in income. I don't think the analysis stops there. And in this case, the kind of interesting twist to this case is that increase is as a direct result of post-judgment efforts. Not efforts during the marriage, but efforts during a second marriage. And so I would suggest to the court that reliance simply on, gee, Dr. Turngren's income has gone up, so no change of circumstances is ill-placed. But it is an appropriate consideration. It is absolutely an appropriate consideration. I would not suggest otherwise to this court. I think that the other problem in this case, and in Judge DeBacco's decision, is this whole concept of self-sufficiency, financial independence. If we look at 510, which is the modification section, it tells the court that among other factors is the efforts, if any, made by the party receiving maintenance to become self-supporting, and the reasonableness of the efforts where they are appropriate. That's a different concept in my book than that which is contained in 504B. And 504A, which the court has to consider when it sets maintenance, and is to be considered at the time of a request for a modification, is the time necessary to enable a party seeking maintenance to acquire appropriate training. That's kind of a more restricted factor, isn't it, than the factor of any efforts, the efforts made by the party receiving maintenance to become self-supporting. And I think that that's where Judge Bachman and I went off in different directions. I see that provision as not just looking at a party's ability to go get employment or keep a job. I see that as all of their efforts, a global approach to how they try to become more financially independent. I'm not here to suggest that Mrs. Turngren could become fully financially independent of her husband, because I've already said we all agree she's a candidate for permanent maintenance. What I'm suggesting to the court is there are significant things that she could have done or that she did that placed obstacles in her ability or her efforts to secure some level, a higher level of self-supporting, such that Dr. Turngren could begin to look at a reduction in what is a very large maintenance award. And so, and I know that you've read the briefs, so I know you're very familiar with the facts, but in this particular case, I want the court to consider the level of support she provided adult children. The enormous amount of cash withdrawals. Those are... Why is it Dr. Turngren's business? Why is it his business? Because he's supporting her and he should support her. You mean the maintenance is something that he has some control over after he's been ordered to pay it? I'm not suggesting to the court that he has any ability to micromanage any more than the trial court wished him. Then why is it his business, what she does with the money that he has ordered to pay to her? It's only his business when, in fact, her use of funds that he's supplying are unreasonable or not associated... What case stands for that proposition, counsel? I'm sorry? What case stands for that proposition? Well, I believe there are several cases that talk about, and we've quoted them, that talk about voluntary payments, bad financial investments... What I'm talking about is what case stands for the proposition that the party ordered to pay maintenance has some interest in how the party receiving maintenance is handling the cash received? I'm not suggesting that there is such a case, nor am I suggesting that this court should make that ruling. Well, that sounds to me like the argument you just made. Well, if it did, then I really poorly presented that argument to the court. I'd like a second shot at it. Go ahead. Okay, because here's what I'm trying to tell the court, I think. It's not that he has an interest in how she spends the money. It's at the point that he requests modification that the manner in which she spends those money, the voluntary decisions she makes, may impact the court's determination and should impact the court's determination as to whether or not those are, in fact, efforts to become self-supporting. So if you give her $7,200 a month and she takes it to Las Vegas every month and she gambles it, I don't have the right or interest to say you shouldn't do that, but I certainly have the right to come to court and say, gee, Judge, her actual needs are far less than the amount of maintenance I'm getting here because she's improperly spending the money, or she's not doing it the right way. She's not using it for her needs. Here she's supporting... So if she invested it in the stock market or other investments, that would be better? Better than supporting adult children? Sure. But wouldn't your argument then be, hey, she's just using this to build up her nest egg, she doesn't need it, and therefore I want to have my obligation reduced? Well, I think that when you look at the standard of living during the course of the marriage, you can consider, and perhaps properly so in the right case, whether or not savings are an appropriate thing that was developed during the marriage and whether or not that should continue. That's far different if she's saving than it is if she's spending it in Las Vegas or if she's giving it to adult children or if she's paying for vet bills or she's doing those things. Those are not her actual needs being met. Those are other people's needs being met. And that, I think, is the difference between my perception of this case and Judge Blockman's perception. Section A-5-2 that you cited repeatedly about reasonableness of efforts to become self-supporting reads this way. The efforts, if any, made by the party receiving maintenance to become self-supporting and the reasonableness of the efforts where they are appropriate. Correct. What does the if any there mean? Well, I read the if any to mean that there might be no efforts, but that doesn't mean it's not a fact that the court should not consider or give no weight to. Well, if there are no efforts, then apparently that can't be the sole criterion, can it? I'm not suggesting any one of these factors is the sole criterion. I'm suggesting there's a more global approach, that you have to consider all factors, not just one. And I think that the problem that I have with Judge Blockman's decision is I don't think he considered all of the factors and appropriated the correct weight to those factors. And I think he centered solely on where Dr. Terngren's money is today and looked at his standard of living today. This case surprises me because I don't understand why the positions aren't reversed. Why it is that it's not Mrs. Wong here arguing that the trial court abuses discretion because her petition to increase the maintenance payment, given that Dr. Terngren's income has doubled, was denied, was an abuse of discretion. The fact that you're here and you say, yes, my client's income has doubled, but look at what she's done. Not enough. And besides that, she's supporting her adult kids with this cash. Strikes me as a touch bizarre, counsel. Well, I understand that, Judge. And I think I'd like to respond in a couple ways, too, if I might. The first is the petition to increase support wasn't denied based on evidence taken. It was dismissed because it was filed in the middle of trial. So there was no evidentiary hearing on it. Okay. Well, based on the evidence now before me, I'm just kind of surprised. I understand. But I think that goes to the first point that I started with with the court, which is his increase in income, which started in mid-2010, and is a $400,000 guarantee. Granted, there are bonuses. I'm not going to suggest to the court that he hasn't had an increase. Okay. From 2004 until 2010, he had no significant increase in income. That's absolutely true by the record. This was filed in August of 2010. And I think more importantly is the concept that that Masters in Business Administration, but for that, he would still be at Sintegra making $275,000, $300,000, perhaps with some COLA. But he wouldn't be making the amount that he's making now. And so one of the profound policy questions I think that this case brings to the court and deserves some attention is, does a former spouse get to, so to speak, eat up the food chain? The case law would seem to indicate, and it's old case law, the case law would seem to indicate that no. The former wife doesn't get to share in the husband's later wealth. And I think that that's one large issue in this case that Judge Bachman and I have a difference on because I believe that he essentially said exactly what Your Honor, Justice Steinman said. He's making $500,000. What's the problem? But he said that, but he didn't increase your client's obligation. He did not. And you made it to the level that your client agreed to when he was making what he was making during the marriage, correct? That's absolutely correct. And I think what we need to also put in context is while Dr. Terngren was making an MBA work and paying an extraordinarily large amount of marital debt, during that time frame, probably $800,000 plus Mrs. Terngren's regular income came into her hands. And we still have a large mortgage on a house. We still have a car loan. What does that mean? Well, I think what it means, Justice Steinman, is that's a lot of money. That's a lot of support. So had she paid off those things, then you wouldn't be here, are you? No, I would be here, are you? I think her actual needs would be down, as I think her actual needs are in any event down. From 2004 to 2011, her needs are down over $2,500 a month. But his maintenance is the same. And I don't think we can forget that the law requires us to look at the standard of living at the time of the marriage, not today. And the standard of living that these folks had, which wasn't characterized by either one of them as it was by Judge Blockman, the standard of living I don't think is close to lavish. If we look at really what was going on at that point, these folks were effectively bankrupt. That is, their debt was higher than their assets. You had two houses that had virtually no equity. You had some cars that were anywhere from 5 to 12 years old. Isn't it different to ask the question, are you living beyond your means versus are you bankrupt? I mean, are you saying that she should be virtually bankrupt because that's how they were during the marriage? Absolutely not. What I'm saying to the court is I think that that is counter to Judge Blockman's assertion that this was some sort of lavish lifestyle. But during the marriage, you mentioned two homes, some vehicles, multiple trips, lots of money spent on the kids regarding the trips and the hockey and all of that. And so they were pretty dedicated to their children and spent quite a bit of money related to them. Is that correct? That is absolutely correct. I would have no question what the court's finding on that. And they, of course, as the court knows, were minor children. So they weren't adult children. But we know how it is. It never seems to change. It does not seem to change, Your Honor. I agree with you on that. But I think it's something different when all of a sudden you break up a family. Decisions that people make when they're married and stay together about how they treat their children, whether or not they let them move back in, whether or not whatever they're going to support is a little bit different than decisions that are made by one party using the money of another party when they're divorced and then coming to court and saying this is part of my necessary living expenses. That's an entirely different proposition in my book. But that's not what the law says, is it? Oh, I think it is what the law says. It says that they should be able, if possible, to maintain the standard of living that they established during the marriage. And I don't quarrel with that. But I don't think the standard of living you have when you have minor children is the standard of living that you have when you don't have minor children. You have no obligation to support them. And I might remind the court that Dr. Turndren is the one who pays for all the college expenses. That's what he agreed to do. It is what he agreed to do. You are absolutely correct. But just because he agreed to do it in 2004 doesn't mean that we stagnate at that point and say you're stuck with that agreement. And we have no obligation on this side to do anything to alter that position, which is kind of where we are with Judge Bachman, isn't it? I mean, the problem we have is that he's released her of essentially any obligation to do more than she's doing now, and has said you can spend the money any way you wish. And Dr. Turndren, you just need to keep sending him the check. Counsel, I'm shocked. I still don't understand, and you keep referring to it, as if he has some claim to supervise or pass upon or approve what she does with the money she gets for maintenance. I'm absolutely not suggesting that, Judge. What I am suggesting is how she spends that money may in fact create a substantial change of circumstances. Because it's just like I said. I've never seen a case that even suggests such a thing. I think that there are cases like the Raynard case that talk about the fact that the former husband isn't obligated to fund a retirement. I'm talking about post. We have maintenance ordered years past, and because of how she's spending the maintenance that has been ordered, we can consider that and reduce it. I've never seen a case that even suggests that. I think that the second Raynard case in fact does suggest that, which is the modification case that came in when she asked for an increase and among other things said, my needs have gone up so high. I need to put money in my retirement. I need to put money in my Roth IRA. I need to do this. I need to do that. And the court said, there's no obligation on your former husband to do that. To increase the maintenance payment. Anything to talk about decreasing because your costs are somehow lesser because of how you're now using the money? No such request was made by Justice Raynard at that point. However, I note in that case, unlike this case, there was a time limit on maintenance. Here this goes on forever. And again, I think that that puts it in somewhat of a different perspective. I think it's impossible in these maintenance cases to take one case and say, boy, this is just like this case. Because we all know that every case is different. And so I think that in this particular case, Judge Blockman simply focused on what I think to some degree this court is focusing on, which is where is Dr. Terngren today? And I think that that is not where the court should be. Okay, thank you, Counsel. Your time is up. You have an opportunity to address this again in rebuttal. I appreciate that. Ms. Wong. May it please the court, Counsel. Counsel. My name is Betsy Pendleton Wong, and I'm here representing Peggy Terngren in this matter. We believe and take the position that the trial court properly denied Dr. Terngren's petition to modify maintenance. As Counsel noted, he filed but did not proceed on his petition to terminate maintenance. The trial court's decision by Justice Blockman, which is in writing and part of the record, sets out in detail the judge's analysis of the facts and the law. He tells that Dr. Terngren had not proved that there had been a substantial change of circumstances warranting a modification of the maintenance amount that had been agreed to by Dr. Terngren and Peggy Terngren when they divorced in 2004 and solved all the issues of support, college, and property division by agreement. The trial court found that the employment that Mrs. Terngren had maintained since 2004 was appropriate employment. The court noted that she had increased her job responsibilities, she had obtained annual increases in pay, and that since she started working, a 401K plan had been instituted in which she had been allowed to participate in with matches by her employer. The company does not offer health insurance, and there's quite a big deal made about that in Dr. Terngren's brief. She has a health insurance private plan that she pays less than $300 a month. I think it's $270 a month. So it's not an exorbitant amount that she is paying for that. The trial court's conclusion that her employment was appropriate was supported by the evidence and was not an abuse of discretion. The trial court noted that she had never worked in the area of her undergraduate degree, which was interior design. The trial court noted that she basically had, after the birth of the three boys in four years, stayed outside the job market except for a little bit of time at the nursery school on a part-time basis when two of the boys were in the nursery school. Dr. Terngren was very involved with the building of a medical practice. Carl Clinic established a satellite clinic in Monticello. Dr. Terngren was the first physician there, and it was very demanding. Part of the strategy of building that clinic was that both spouses were very active in community events. As you saw in the brief, she was involved in the hospital auxiliary. She was involved with the boys' school. She was involved with the founding of a youth soccer league. She made a lot of acquaintances in that community, and that underscored the development of the practice. She also noted in my brief the parties got married right before he started medical school. She worked during the time her husband was in medical school until, I believe, one of the boys, I forget if it's the first or second boy, was born. She was there handling the boys, the home life, community interactions, and shuttling the boys back and forth to soccer practice. Some amount of effort was put forward talking about quibbling over the judge's finding that the parties had an extremely comfortable standard of living. I think the finding by the court of that is well supported by the evidence and was not an abuse of discretion. The parties bought a home for over $100,000 soon after he joined the Carle Clinic Association. They spent as much remodeling the home and adding to the acreage around the home as they spent on the home. So basically they doubled. Was that in Monticello? It's in Monticello, yeah. So I think they were valuing it around $200,000, Your Honor. Then while the boys were young, very young, they had family season passes for all the University of Illinois football games. Then the children became involved in hockey. As you saw in my brief, that is Dr. Terngren's hobby. He's very involved with hockey. He coached as an assistant and then as the head coach of the University of Illinois club team. They had their boys on traveling hockey teams, which is an additional expense because you have to pay not only for the membership but the hotels and the restaurants as you're traveling around the state and Midwest with the children. They had NCAA Final Four hockey tournament tickets, which is another expense. They had the expense of going to see the Blackhawk hockey games in Chicago. The testimony was, and they didn't disagree on this, they took a number of vacations when the boys were fairly small to Disney in Florida. And then when the boys became more involved with hockey, they took them to the special hockey summer camps in Colorado and then spent another week as a family in the mountains there. They belonged to the Urbana Country Club. The boys had lessons at the Urbana Country Club. And then there were the things that they could afford that sort of plays in the background when you can't afford them. But when you can't afford them, they're very important. They always had health insurance. They always had life insurance. They always had insurance. There were three sons born of the marriage? There were three sons. They were four years apart. Apparently there's some reference to what's going on now. What did the evidence show? The evidence shows that the boys, and we can talk about the psychological studies, but this is not the place. None of the boys are physicians. Two older boys graduated from the University of Illinois, which is again a nice thing that parents can do. A comfortable standard of living. The oldest boy is married, has one child, a grandchild that she's accused of spending money on buying the baby mattress bed and things like that. He's working three jobs, Your Honor. The second son is not married. He is working for Carl Clinic in a, I think he's some tech position. The third son didn't go to college except for a few courses at Parkland. He's the one that has dyslexia. They sent him to private school on the East Coast for two and a half years, and then they sent him to a special school in Arizona some of the time. Again, sort of a nice thing to be able to do. He's working as a deputy for Piatt County for the Sheriff's Department. So the boys, two of the boys, the two older ones, were living with Dr. Terngren in 2004 when the divorce, and I think one was living on campus and none of the boys were living with their mother at that time. None of the boys have been living with their mother for some time now. The deputy, before he was a deputy, I don't know if he's a deputy, he works at the jail. He was living with his mother, and that was the one where the fiance was living with there a few months, and then the marriage, the engagement fell through, and that fiance actually paid Mrs. Terngren back the $5,000, although counsel keeps saying that she gave them, she's counting that $5,000 in the amount that she spent on the children, but she got that amount back. So all the boys now are in their 20s, Your Honor. None of them are living with her. The family meals, there was a meal when she went off to Chicago for the baby's christening. That is on Chris's list, and then there were some other meals at Biagi's and Olive Garden and things that she claims Squandering on the family. Pardon? Squandering on the family. Yeah, squandering on the family. Well, anyway, we have significant disagreements about this case, as you can see in our briefs, and significant ways of viewing the case. Even if Dr. Terngren's income hadn't increased a penny, he can't claim that this is an exorbitant amount because he agreed to this amount. He, by agreeing, thought it was reasonable, or at least thought it was within his ability to pay. And the statute very clearly says you consider the income of each of them. That's the statute. So the judge did not abuse his discretion, noting the increase in Dr. Terngren's earnings. The attempt to say, oh, well, all those increases in earnings are due to his MBA. I don't know of a case, I've never seen a case where what they do after the marriage, if that's the reason why the income has gone up. You know, I asked him, I said, doctor, could you have this job you have if you didn't have your medical degree? And he says no.  So, I mean, it's like cutting a match in half to try to decide which of them. It's the sum total. It's his experiences during the marriage. He was a practicing physician. Then he served on the Carl Board of Directors. Then he served at Health Alliance. So it's his sum total, like any of our sum totals. Our careers are based on all the lucky breaks we had. And a lot of his initial years, Mrs. Terngren was very much a supportive spouse. He didn't deny that. And a very helpful spouse. And he agreed this was an appropriate amount. I just think that Judge Blackman's decision was not an abuse of his discretion. It's a very carefully written decision, as his decisions are. Ms. Fisher has some problems with he didn't analyze in detail each particular factor. Some of the factors she said he didn't analyze, he did analyze. He made statements of them. He recognized the division of the property. We've got some disagreements between them about whether she got equity. I think Chris's brief says she got more equity in her house. Neither of them had any equity in his house. His 2004 financial affidavit shows neither of them had any equity in the house. So there's a little bit of overstatement here and there. But the basic, is this an appropriate amount of maintenance? When the trial court said, yes it is, there was no abuse of discretion in that. And some of these theories, I've never seen them in cases. They're new to me. She has remained in the same house, in the same community. She's worked a secure job, and that was very important. From 2004 to 2011, we had a major recession in this nation. So this business, she should have gone off and gotten some other job. As I tried to say in my brief, but I think she missed it. If she had gotten another job, she might have ended up with an unemployment check, rather than a continuation of the security that she has in her current job. But that was just something that Ms. Fisher didn't understand my argument on that. So if the court doesn't have any other questions of me, I will sit down. We see none. Thank you counsel. Thank you very much. Ms. Fisher, any rebuttal, ma'am? There are a large amount of factual disputes, and I think the court can sort those out. And I don't intend to use a few minutes here to go through them with the court, understanding the court is going to do it. I really do want to concentrate on this issue that I think Justice Feigman brought up. And I'd like you to consider the opinions that were rendered in the Murphy case that we cited, where one of the things that the court did, and granted it's a petition to increase maintenance, and I get that, these things are different, but of course, it's a burden of proof argument. And so when you file a petition to increase, that burden goes on the person seeking to increase, just like it was on me for the decrease. And so I do think that there is some analogy that we need to take to those cases. And in the Murphy case, they specifically point to the fact that she had a son, an adult son, living in a house, rent free. That's one reason why they felt that she had overstated her expenses, and wasn't in need of an increase. And so the flip of that has to be the same. That is, when we look at what she does with her son. Which case was that? That would be Murphy. I'm looking, oh, 3rd District, 2005 decision? That's correct. Okay, well, the good news is, on the appellate court, we don't have to follow that decision if we don't think it makes sense. Why does it make sense? Well, I think it does make sense, Judge, particularly with the Rainer decision, where the court, in the same sense, this court, affirmed the trial court in a modification. Again, I understand it was seeking an increase. It's a burden of proof argument on the substantial change of circumstances. Found that expenses claimed by the wife, who sought an increase, were not reasonable or were not expenses that were actual or necessary. And so, again, I think the flip applies. It can't just apply one way. And so I think, you know, I think it may get down to this. But aren't there completely different considerations when you're talking about an increase? Here, we have what these parties agreed to. He was making a lot less money at that time and agreed to that. There was the standard of living during the marriage. Isn't it different in that situation than when you're looking at, now I want more, and I'm spending money on this, that I could cut back on that, but now I want more? Isn't that different? I don't think it is when it comes to the pure issue of a substantial change of circumstances. I have two steps to dance in this dance. I have to dance the substantial change of circumstances, and then I have to show you that a modification is appropriate. And so while they are somewhat the same and the arguments are somewhat similar on both, the fact is they are two different, and I think that they get a little confused. What is the substantial change in circumstance? That there has been some drastic decrease in her needs? That her actual needs are far less than the maintenance that's been awarded. Her needs are just as great now as they were when they married because the mortgage on the house is the same. That's correct. There are any number of people that would say it was absolutely ridiculous to have three children and travel hockey and not pay down a mortgage. There are other people that would say quality of life for my family is far more important than paying down that mortgage because I'll be able to pay it down in the future. That is a value judgment that parents are entitled to make when they're married. When they're not married anymore. That's correct. And you've agreed to something. Value judgments no longer control. And a value judgment that says, I don't think you should continue to provide either necessities or luxuries to our adult children or spend lavishly. And I'm unable to understand what that word could possibly mean in regard to a grandchild because no dollar spend is lavish. That's a personal editorial comment. How does the court cope with that? In terms of a lady that makes $30,000, her income would be what? $115,000 or $120,000? All of which is taxable if you count her maintenance. That's correct. And she has a $200,000 mortgage and a car loan. That's correct. I don't know that she's got that much disposable income. Well, and again, I think that doesn't that go into this whole problem that where you have, and let's not forget, you've got an $82,000 inheritance on the way in 2007. So, I mean, we have in excess of $800,000 to her, not including her income, in about an eight-year period. And we only have a slight reduction in her mortgage. And I agree with you. She still has that mortgage. But those are decisions that she made. And that they made together when they were together. It isn't anything out of kilter. Well, I'm not sure that I quite concur with the court on that. But I understand where the court's going. But don't you think that she, at some point, has a, you know, is maintenance remedial or is it an entitlement? If we're calling it an entitlement, then you need to affirm Judge Bachman. But if you want to call it rehabilitative maintenance or remedial maintenance, it should have been called that in the beginning. But I think permanent maintenance still has a factor of remedial to it. Thank you, Counselor. Your time's up. We'll take a break. Thank you. We'll take a recess. And the advisory will be recess until tomorrow.